UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| ACTIVEPROSPECT, INC., <br><br> Plaintiff, <br><br> v. <br><br> TECH PROSPER LLC a/k/a COMPLIANT LEAD a/k/a LEAD PROSPER and DATA PROSPER, LLC, <br><br> Defendants. | Civil Action No. 6:22-cv-00525 <br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff ActiveProspect, Inc. (hereinafter, "ActiveProspect" or "Plaintiff") alleges as follows against Defendants Tech Prosper LLC a/k/a Compliant Lead a/k/a Lead Prosper ("Tech Prosper) and Data Prosper, LLC ("Data Prosper") (collectively, "Defendants").

### I. NATURE OF THE ACTION

1. This is a breach of contract and patent infringement action arising under the laws of the State of Texas and the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, to end (a) Defendants' infringement of Plaintiff's United States Patent No. 10,614,417 (the "'417 Patent"), a copy of which is attached hereto as Exhibit A; (b) Defendants' development of a competing and infringing product in violation of the parties' September 21, 2021 Reseller Agreement (the "Reseller Agreement"), attached hereto as Exhibit B; and (c) Defendants' unlawful copying of ActiveProspect's products in violation of ActiveProspect's Terms of Service, attached hereto as Exhibit C. Plaintiff seeks injunctive relief and monetary damages.

1

## II. PARTIES

2. Plaintiff ActiveProspect, Inc. is a corporation organized and existing under the laws of the State of Delaware. Plaintiff has its principal place of business at 4009 Marathon Blvd., Austin, TX 78756.

3. ActiveProspect is the owner of the entire right, title, and interest of the '417 Patent.

4. On information and belief, Defendant Tech Prosper LLC is a limited liability company organized and existing under the laws of the State of Florida. On information and belief, Tech Prosper's principal place of business is located at 36 Rosscraggon Road, Unit F, Asheville, NC 28803. On information and belief, Tech Prosper is also known as, and holds itself out to the public as, Compliant Lead and Lead Prosper.

5. On information and belief, Defendant Data Prosper, LLC is a limited liability company organized and existing under the laws of the State of Delaware. On information and belief, Data Prosper's principal place of business is located at 36 Rosscraggon Road, Unit F, Asheville, NC 28803.

6. On information and belief, Defendants Tech Prosper and Data Prosper share common officers and directors, share the same headquarters, and fail to observe corporate formalities.

7. For example, on information and belief, Ross Breiman serves as the CEO and/or managing member of both Defendants. Additionally, both Defendants hold themselves out as sharing a common office space at 36 Rosscraggon Road, Unif F, Asheville NC 28803.

8. Defendants' also hold themselves out to the public as a single company. Defendants' Chief Technical Officer, Raul Predescu has stated Defendants are "the same company." He has

also stated, referencing the two Defendants, that "we're all one company" and the Defendants "want to make sure people know that."

### III. JURISDICTION AND VENUE

9. This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

10. The Court has supplemental jurisdiction over Plaintiff's claims for breach of contract under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's claims for patent infringement.

11. Pursuant to the Reseller Agreement, Tech Prosper agreed "that any dispute arising out of or relating to this Agreement shall be instituted and prosecuted in the courts of competent jurisdiction of the State of Texas, and the parties hereto irrevocable (sic) submit to the jurisdiction of said courts located in the State of Texas, and waive any rights to object to or challenge the appropriateness of said forums." Ex. B ¶ 23.

12. This Court has personal jurisdiction over Defendant Tech Prosper because Defendant Tech Prosper has consented to personal jurisdiction in the State of Texas pursuant to the forum selection clause in the Reseller Agreement that Defendant Tech Prosper signed with Plaintiff.

13. This Court has personal jurisdiction over Defendant Data Prosper because Defendant Data Prosper has consented to personal jurisdiction in the State of Texas pursuant to the Terms of Service that Defendant Data Prosper agreed to when signing up for an account with ActiveProspect. This Court has personal jurisdiction over Defendant Data Prosper because, on information and belief, Data Prosper is an alter ego of Defendant Tech Prosper and is therefore

bound by the Reseller Agreement. This Court has personal jurisdiction over Defendant Data Prosper because Data Prosper is so closely related to Tech Prosper that it was foreseeable that it would be bound by the Reseller Agreement's forum selection clause.

14. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b) as to Defendant Tech Prosper because Defendant Tech Prosper has consented to venue in this District pursuant to the forum selection clause in the Reseller Agreement that Defendant Tech Prosper signed with Plaintiff.

15. Venue is proper in this District as to Defendant Data Prosper because it consented to venue in this District pursuant to a forum selection clause in ActiveProspect's Terms of Service. Venue is proper in this District as to Defendant Data Prosper because, on information and belief, Data Prosper is an alter ego of Defendant Tech Prosper and is therefore bound by the forum selection clause in the Reseller Agreement. Venue is proper in this district as to Defendant Data Prosper because Data Prosper is so closely related to Tech Prosper that it was foreseeable that it would be bound by the Reseller Agreement's forum selection clause.

### IV.    FACTUAL BACKGROUND

16. In the online marketplace, companies frequently seek to reach out and collect information about prospective customers through a process known as "lead generation." Prospective customers complete online contact forms on websites advertising various services that request basic information, such as name and contact information. This information or "opt-in leads" can then be sold to an interested company, which can use the leads for consent-based marketing campaigns.

17. ActiveProspect and Defendants are competitors in the lead management marketplace. ActiveProspect and Defendants offer competing software as a service ("SaaS") products for managing opt-in leads.

18. ActiveProspect offers a suite of SaaS products for consent-based marketing. ActiveProspect was founded by Steven Rafferty, its CEO, in 2004. Since that time, Rafferty has built ActiveProspect into a leader in the lead management industry and has developed a patented, novel solution to one of the industry's most troublesome lead management problems.

19. Defendants, in contrast, are relative newcomers to the lead management industry. Defendants have not developed any intellectual property of their own and have not established a notable presence or role in the market.

A.  **ActiveProspect and Its Products.**

20. ActiveProspect's products include LeadConduit, a lead management platform; LeadsBridge, a marketing integration solution; and TrustedForm, a patented third-party authentication service that verifies the authenticity of internet generated leads.

21. Until the invention of TrustedForm, there was not a reliable way for the purchasers of leads to be sure that the lead was authentic. This led to numerous problems complying with federal and state statutes regarding unsolicited communications. The lack of verification also decreased the value of the lead because the purchaser had no way to know if the lead was authentic or fictitious.

22. To solve this problem, the inventors of TrustedForm developed a novel solution to provide a "verification token" with each lead that would establish its authenticity. Ex. D.

23. By using a proprietary computer script, TrustedForm verifies that each lead was actually created by a prospective customer, ensures the prospective customer consented to contact, and includes a unique reference key that can be used to confirm this information.

24. Additionally, TrustedForm provides proof that the customer consented to be contacted by capturing a session replay of the customer's interaction with the contact form.

**B. ActiveProspect Protects Its TrustedForm Invention with a Patent.**

25. On May 12, 2011, ActiveProspect filed U.S. Patent Application No. 13/106,641 entitled "System and Method for Electronic Lead Verification."

26. U.S. Patent Application No. 13/106,641 issued as U.S. Patent No. 10,614,417 on April 7, 2020.

27. The '417 Patent is directed "to a system and method for verifying a lead that was collected from a website." Ex. A, '417 Patent at 1:7-9.

**C. Defendants Recognize the Value of ActiveProspect's Technology and Business Model and Begin Targeting Plaintiff.**

28. In 2021, Ross Breiman, the CEO or managing member of Defendants approached representatives of ActiveProspect and expressed his interest in in a potential business transaction between the parties, whereby ActiveProspect would acquire some or all of his business.

29. Representatives of ActiveProspect later met with Defendants' personnel for a lunch while attending a digital marketing trade show held in New York City on July 19–20, 2021.

30. At the lunch meeting, Breiman acknowledged that ActiveProspect is a market leader in the lead management industry and in the niche lead verification market. Although Breiman expressed appreciation for ActiveProspect's technological advancements in the lead management industry, he criticized ActiveProspect's products. Breiman claimed that ActiveProspect's unpatented LeadConduit product was too expensive and admitted that his team had copied LeadConduit to create their own competing product, Lead Prosper, which Defendants offer for a much lower price.

31. At the conclusion of the business lunch, the parties agree to collaborate where possible but otherwise went their separate ways.

32. ActiveProspect had no interest in acquiring a company that admittedly copied its product, LeadConduit. Additionally, Defendants lacked any unique intellectual property that would justify an acquisition.

**D.    Tech Prosper Signs and Then Breaches the Reseller Agreement.**

33. Ultimately, ActiveProspect agreed to work with Defendant Tech Prosper by allowing Tech Prosper to become an authorized reseller of ActiveProspect's patented TrustedForm product. On September 21, 2021, Tech Prosper entered into the Reseller Agreement with ActiveProspect.

34. Under the terms of the Reseller Agreement, Tech Prosper was obligated to "use its best efforts to promote the sale of [TrustedForm]." Ex. B. ¶ 2.

35. Moreover, Tech Prosper agreed that "Ownership of all applicable copyrights, trade secrets, patents and other intellectual property rights in the Product shall remain vested in AP, or in AP's licensors" and that "Reseller shall not, pursuant to this Agreement, have or obtain any right, title, or ownership interest in the applicable copyrights, trade secrets, patents or other intellectual property rights in the Product." Ex. B. ¶ 9.

36. One of the rights secured by the '417 Patent is the right to use the claimed methods, apparatuses, and non-transitory computer readable mediums. Under the terms of the agreement, Tech Prosper agreed it would not have the right to use the '417 Patent.

37. Pursuant to the terms of the Reseller Agreement, ActiveProspect worked with Tech Prosper to provide pricing guidance and assist with a go-to-market strategy for reselling TrustedForm. However, Tech Prosper never generated any revenue for ActiveProspect under the Reseller Agreement.

**E.    Data Prosper Agrees to ActiveProspect's Terms of Service.**

38.    On February 27, 2020, Ross Breiman, acting on behalf of Data Prosper, created a paid TrustedForm account on ActiveProspect's website and thereby agreed to its Terms of Service.

39.    In those Terms of Service, Data Prosper agreed that it would not "modify, copy, or create a derivative work of any part of the ActiveProspect Technology" or "reverse engineer, disassemble, or decompile any of the ActiveProspect Technology." Ex. C.

40.    The ActiveProspect Technology includes TrustedForm. Ex. C.

**F.    ActiveProspect Discovers Defendants' New Knock-Off Product—Compliant Lead.**

41.    Far from using their "best efforts" to promote the sale of TrustedForm, and despite their acknowledgment under the Reseller Agreement that Defendants had no right to use the '417 Patent and agreement not to copy ActiveProspect's Technology in the terms of service, Defendants used its access to the TrustedForm product to copy ActiveProspect's patented technology and develop a directly competing knock-off product, Compliant Lead.

42.    Representatives of ActiveProspect first discovered Compliant Lead in March 2022 at the LeadsCon conference in Las Vegas, NV, where Defendants were marketing and selling Compliant Lead and passing it off as Tech Prosper's own creation and intellectual property.

43.    While at LeadsCon, Defendants' representatives admitted while marketing the product that Compliant Lead (1) "took the best parts of [TrustedForm] . . . and put them into one," (2) is "the same idea" as TrustedForm, and (3) has "everything that . . . TrustedForm has."

44.    Defendants' representative further claimed that they had developed their Compliant Lead product in as little time as 4-5 months.

45.    Those same representatives made derogatory comments about TrustedForm, falsely claiming that it is difficult to store a TrustedForm certificate, that Trusted form has "so many bugs

8

and errors," and that its "page scanning text is not good" in an attempt to lure customers away from TrustedForm.

46. Despite claiming the superiority of Compliant Lead, Defendant's representatives admitted that Defendants priced the product much cheaper than TrustedForm.

47. At the conference, other LeadsCon attendees approached ActiveProspect's representatives to express their surprise that Compliant Lead had copied TrustedForm.

48. Defendants solicited at least one of ActiveProspect's TrustedForm clients and offered Compliant Lead as a lower-cost option while at LeadsCon.

49. At the LeadsCon conference, ActiveProspect discovered that Defendants sell and advertise Compliant Lead through a separate website, compliantlead.com. *See* Ex. E; Ex. F.

50. On the Compliant Lead website, Defendants describe the product as "a Lead certification service that autonomously certifies the provenance of Internet Leads using proprietary JavaScript ("Compliant Lead Script") deployed on a web page with a contact request form." Ex. F.

51. Defendants claim that Compliant Lead generates a "digital token" which contains information regarding the visitor who filled out the form. Ex. F.

52. Defendants refer to these Compliant Lead tokens as a "Token of Authenticity." Ex. G.

**G. Upon Investigation, ActiveProspect Confirms that Defendants Copied Its Patented TrustedForm Product.**

53. After learning of Compliant Lead, ActiveProspect quickly began an investigation into the features and functionalities of Compliant Lead. ActiveProspect's initial investigation revealed that Compliant Lead was nothing more than a knock-off of ActiveProspect's patented TrustedForm technology.

9

54. To confirm the functional similarities between TrustedForm and Compliant Lead, ActiveProspect's CTO, Alexander Wolfe, undertook a detailed source code review of Compliant Lead's JavaScript.

55. Wolfe, who is one of the named inventors of ActiveProspect's '417 Patent, confirmed that Compliant Lead performs each and every step of at least claim 1 of the '417 Patent.

56. Wolfe's review of Compliant Lead's JavaScript revealed additional evidence of deliberate copying. For example, part of the Compliant Lead code expressly references "trustedform" by name.

57. Beyond the functional similarities between TrustedForm and Compliant Lead, there are other similarities. First, the color scheme used by Compliant Lead is a copy of the color scheme initially used by TrustedForm when it was first launched. Second, the product description and terms of service for Compliant Lead are substantially similar to the terms of service for TrustedForm, with only minor variations in the language. Finally, the visual appearance of the Compliant Lead "Tokens of Authentication" are strikingly similar to the visual appearance for TrustedForm's "Certificate of Authenticity."

58. The extent of the similarities between Compliant Lead and TrustedForm proves that Compliant Lead is not the result of independent development but, instead, is Defendants' thinly-veiled attempt to knock-off and profit from TrustedForm's patented technology, goodwill, and market leadership.

**H.     ActiveProspect Notifies Defendants of Their Breach of the Reseller Agreement and Violation of ActiveProspect's Intellectual Property Rights**

59. On April 6, 2022, ActiveProspect's counsel sent a cease-and-desist letter to Defendants describing Defendants' breach of the Reseller Agreement, providing notice of the '417 Patent, and explaining how Compliant Lead infringes the '417 Patent. Ex. H; Ex. I.

60. On April 13, 2022, counsel for Defendants responded to the cease-and-desist letter. In the letter, Defendants admitted that they had generated at most "a single lead" pursuant to the Reseller Agreement (though ActiveProspect is not aware of any such lead), which gave credence to ActiveProspect's suspicion that Defendants had entered into the Reseller Agreement for reasons other than generating leads. Ex. J.

61. In the April 13 letter, Defendants' counsel did not address ActiveProspect's notice that Defendants' Compliant Lead product infringes the '417 Patent, nor did he seek to begin a meaningful dialogue. Instead, he claimed that Defendants were "flattered by the attention" and were "left in a state of bemusement" by ActiveProspect's counsel's letter. Ex. J.

62. Further, as Breiman had done months ago, counsel for Defendants suggested that ActiveProspect should be interested in acquiring Defendants and proposed that the dispute be resolved through a "business solution." Finally, as the only alternative to a "business solution," Defendants' counsel threatened to attack the validity of the '417 Patent in "scorched earth . . . litigations." Ex. J.

### V. COUNT I: INFRINGEMENT OF THE '417 PATENT

63. Plaintiff incorporates the allegations of paragraphs 1–62 as if fully stated herein.

64. ActiveProspect owns all right, title, and interest in the '417 Patent.

65. The '417 Patent is in effect and presumed to be valid under the U.S. Patent Laws.

66. Claim 1 of the '417 Patent claims:

A method comprising:

receiving a first request at a lead verification server from a web browser in response
to the web browser visiting a web page of a lead generating website and

executing a lead verification service script, the lead generating website configured to collect lead data for a lead generator;

responding to the first request at the lead verification server by sending a reference key to the web browser;

collecting information about the lead generating website and information associated with a user of the web browser;

associating the collected information with the reference key;

receiving, from an interested third party that is separate from the lead generating website and the lead generator after the interested third party receives the lead data and the reference key from the lead generator, a second request for verification of the lead data, the second request including the reference key; and

in response to the second request, sending at least some of the collected information to the interested third party.

67. Compliant Lead receives a request from a web browser in response to the web browser visiting a lead generating website and executing a lead verification script. Ex. F.

68. Compliant Lead responds to the requests by sending a reference key to the web browser. Ex. F; Ex. G.

69. Compliant Lead collects information about the lead generating website and information associated with a user of the web browser. Ex. G.

70. Compliant Lead associates the collected information with a reference key. Ex. F; Ex. G.

71. Compliant Lead receives a second request for verification of the lead data, including the reference key, from an interested third party separate from the lead generating

website and the lead generator once the interested third party receives the lead data and the reference key. Ex. F.

72. Compliant Lead sends at least some of the collected information to the interested third party. Ex. F.

73. Claim 6 of the '417 Patent describes an apparatus designed to perform the method of Claim 1.

74. On information and belief, Compliant Lead contains a communications interface configured to send and receive information.

75. On information and belief, Compliant Lead contains a memory configured to store instructions.

76. On information and belief, Compliant Lead contains a processing device configured to execute the instructions stored on the memory.

77. On information and belief, Defendants have been and still are directly infringing at least claims 1 and 6 of the '417 Patent, either literally or under the doctrine of equivalents, under 35 U.S.C. § 271(a) by selling or offering for sale the Compliant Lead product and its corresponding certificates and/or by using, testing, or demonstrating the Compliant Lead product and its corresponding certificates.

78. On information and belief, Defendants have been and still are indirectly infringing the '417 Patent under 35 U.S.C. § 271(b) by actively inducing direct infringement by customers who use Compliant Lead through advertising, marketing, selling, offering for sale, and instructing customers of its Compliant Lead script while Defendants had full knowledge of the '417 Patent. Defendants knew or should have known that their actions would induce direct infringement of the

'417 Patent by their customers and intended that their actions would induce direct infringement by their customers.

79. On information and belief, Defendants have been and still are indirectly infringing the '417 Patent under 35 U.S.C. § 271(c) by providing their Compliant Lead script, a non-staple article of commerce, to customers for use in an infringing method with full knowledge of the '417 Patent and knowledge that the Compliant Lead software is used by their customers as a material part of the claimed inventions of the '417 Patent.

80. Defendants will continue to infringe unless enjoined by this Court.

81. After learning of the '417 Patent, Defendants deliberately and fragrantly continued selling and offering for sale their infringing product and services while refusing to acknowledge their infringement of the '417 Patent.

82. On information and belief, Defendants have knowingly and willfully infringed the '417 Patent.

83. As a result of Defendants infringement of the '417 Patent and intent to continue infringing the '417 Patent, ActiveProspect has and will suffer irreparable harm and will continue to suffer irreparable harm unless Defendant's infringing activities are enjoined by this Court.

84. ActiveProspect will be greatly and irreparable harmed unless preliminary and permanent injunctions are issued enjoining Defendants and their agents, servants, employees, attorneys, representative, and all others acting on their behalf from infringing the '417 Patent.

## VI. COUNT II: BREACH OF THE RESELLER AGREEMENT

85. Plaintiff incorporates the allegations of paragraphs 1–84 as if fully stated herein.

86. On September 21, 2021, ActiveProspect and Tech Prosper executed a valid and enforceable written contract, the Reseller Agreement.

87.     Because it is an alter ego of Tech Prosper, Defendant Data Prosper is bound by the Reseller Agreement.

88.     The Reseller Agreement indicated that Defendants would not obtain or have rights to the '417 Patent, which includes the right to use the '417 Patent. Specifically, Section 9 of the Reseller Agreement states as follows:

> Ownership of all applicable copyrights, trade secrets, patents and other intellectual property rights in the Product shall remain vested in AP . . . . For the avoidance of doubt, Reseller shall not, pursuant to this Agreement, have or obtain any right, title, or ownership interest in the applicable copyrights, trade secrets, patents or other intellectual property rights in the Product.

Ex. B ¶ 9.

89.     ActiveProspect fully performed its contractual obligations.

90.     Defendants breached the contract by developing a competing and infringing product, Compliant Lead, which uses the methods, apparatuses, and non-transitory computer readable mediums protected by the '417 Patent.

91.     In effect, despite its explicit acknowledgement that it did not have a right to use the '417 Patent, Defendants have been and are continuing to use the '417 Patent.

92.     Defendants' breach has caused and will cause further injury to ActiveProspect in the form of at least lost profits and irreparable loss of market share and price erosion.

### VII.     COUNT III: BREACH OF THE TERMS OF SERVICE

93.     Plaintiff incorporates the allegations of paragraphs 1–92 as if fully stated herein.

94.     In September 2021, ActiveProspect and Data Prosper executed a valid and enforceable written contract, the ActiveProspect Terms of Service.

95.     As an alter ego of Data Prosper, Tech Prosper is bound by the ActiveProspect Terms of Service.

96. The Terms of Service required that Defendants refrain from copying, creating a derivative work of, reverse engineering, disassembling, or decompiling any of ActiveProspect's Technology, which includes TrustedFrom. Specifically, ActiveProspect's terms of service state:

> You will not, directly or indirectly: (i) modify, copy, or create a derivative work of any part of the ActiveProspect Technology; (ii) reverse engineer, disassemble, or decompile any of the ActiveProspect Technology; (iii) disclose the results of any benchmarking of the Services without the prior written consent of ActiveProspect; (iv) attempt to circumvent any usage tracking or usage limits or other use restrictions that are built into the Service.

97. ActiveProspect fully performed its contractual obligations.

98. Defendants breached the contract by using, copying, creating a derivative of, reverse engineering, disassembling, and/or decompiling TrustedForm to develop Compliant Lead.

99. Defendants' breach has caused and will cause further injury to ActiveProspect in the form of at least lost profits and irreparable loss of market share and price erosion.

## VIII. JURY TRIAL DEMAND

100. ActiveProspect demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

101. Plaintiff ActiveProspect, Inc. respectfully requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

   A. An adjudication that Defendants have directly infringed, either literally and/or under the doctrine of equivalents, one or more claims of the '417 Patent;

   B. An adjudication that Defendants have willfully infringed one or more claims of the '417 Patent;

   C. An adjudication that Defendants have breached the Reseller Agreement;

   D. An adjudication that Defendants have breached the Terms of Service;

E. Preliminarily and permanently enjoin Defendants pursuant to 35 U.S.C. § 283 and TEX. CIV. PRAC. & REM. CODE § 65;

F. An award of damages to be paid by Defendants adequate to compensate Plaintiff for Defendants' past infringement of the '417 Patent, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court, pursuant to 35 U.S.C. § 284, including up to treble damages for Defendants' willful infringement;

G. An award of damages to be paid by Defendants adequate to compensate Plaintiff for Defendants' breach of the Reseller Agreement;

H. An award of damages to be paid by Defendants adequate to compensate Plaintiff for Defendants' breach of the Terms of Service;

I. That this Court declare this to be an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285;

J. That this Court award Plaintiff its reasonable attorneys' fees in accordance with TEX. CIV. PRAC. & REM. CODE § 38.001 and ¶ 12 of the Reseller Agreement;

K. Any further relief that the Court deems just and proper.

Dated: May 25, 2022

Respectfully submitted,

*/s/ Michael A. McCabe*
Michael A. McCabe
Texas Bar No. 24007628
mmccabe@munckwilson.com
Amy. E. LaValle
Texas Bar No. 24040529
alavalle@munckwilson.com
MUNCK WILSON MANDALA LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 fax

*Attorneys for Plaintiff ActiveProspect, Inc.*

# CERTIFICATE OF SERVICE

This is to certify that a courtesy copy of the foregoing document has been served via email and overnight delivery via Federal Express to the following attorney for Defendants:

Robert Garson
20803 Biscayne Boulevard, Suite 405
Aventura, Florida 33180
rg@gs2law.com
(305) 780-5212

*/s/ Michael A. McCabe*
Michael A. McCabe