PUBLIC VERSION

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| ACTIVEPROSPECT, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>TECH PROSPER LLC a/k/a<br>COMPLIANT LEAD a/k/a<br>LEAD PROSPER and<br>DATA PROSPER, LLC,<br><br>     Defendants. | Civil Action No.6:22-cv-00525-ADA<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

    A.  ActiveProspect Invents TrustedForm and Obtains the '417 Patent. .................................. 2

    B.  ActiveProspect Discovers Defendants' Knock-Off Product, Compliant Lead.................. 5

    C.  Defendants Utilize a Harmful Pricing Model. ...................................................... 8

    D.  ActiveProspect Asked Defendants to Stop Infringing the '417 Patent............................. 8

III.  LEGAL STANDARD........................................................................................ 9

IV.   ACTIVEPROSPECT IS ENTITLED TO A PRELIMINARY INJUNCTION ..................... 10

    A.  ActiveProspect Is Likely to Succeed on the Merits of Its Infringement Claim. ............... 10

        1.  Compliant Lead Willfully Infringes the '417 Patent. .................................. 10

        2.  The '417 Patent Is Valid. ........................................................... 13

    B.  ActiveProspect Will Be Irreparably Harmed in the Absence of an Injunction................ 13

        1.  There Is Only One Other Legitimate Competitor Who Offers a Similar
            Product. ........................................................................ 14

        2.  Defendants' Entrance to the Market Will Cause Price Erosion............................. 16

        3.  Competing Against a Knock-Off Version of ActiveProspect's Own
            Product Is, on Its Own, Irreparable Harm.................................... 18

    C.  The Balance of Hardships Favors ActiveProspect........................................... 19

    D.  The Public Interest Favors Protecting ActiveProspect's Patent Rights. .......................... 20

V.    CONCLUSION................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                                    **Page(s)**

*Abbott Labs. v. Andrx Pharm., Inc.*,
   452 F.3d 1331 (Fed. Cir. 2006)...................................................................................................20

*Allied Mktg. Grp., Inc. v. CDL Mktg.*, Inc.,
   878 F.2d 806, (5th Cir. 1989) ....................................................................................................13

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   695 F.3d 1370 (Fed. Cir. 2012)..................................................................................................14

*Atlas Powder Co. v. Ireco Chemicals*,
   773 F.2d 1230 (Fed. Cir. 1985)..................................................................................................18

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008)....................................................................................................19

*Brooktrout Inc. v. Eicon Networks Corp.*,
   No. 2-03-CV-59, 2007 WL 1730112 (E.D. Tex. June 14, 2007) ...........................................14

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*,
   15 F.3d 1573 (Fed. Cir. 1993)....................................................................................................10

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)..............................................................................................14, 19

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*,
   908 F.2d 951 (Fed. Cir. 1990).......................................................................................................9

*Gaymer Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*,
   790 F.3d 1369 (Fed. Cir. 2015)..................................................................................................13

*Golden Hour Data Sys., Inc. v. emsCharts, Inc.*,
   No. 2:06-CV-381-JRG, 2014 WL 8708239 (E.D. Tex. Mar. 31, 2014)...................................15

*Gonza LLC v. Mission Competition Fitness Equip. LLC*,
   No. W-21-CV-00771-ADA, 2021 WL 5657193 (W.D. Tex. Dec. 1, 2021)..................*passim*

*Johnston v. IVAC Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989)..................................................................................................10

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
   848 F.3d 1358 (Fed. Cir. 2017)..................................................................................................10

*MGM Well Services, Inc. v. Mega Lift Sys., LLC*,
   505 F. Supp. 2d 359 (S.D. Tex. 2007) .......................................................................................20

*Miner, Ltd. v. Anguiano*,
    383 F. Supp. 3d 682 (W.D. Tex. 2019) ................................................................10

*Mint, Inc. v. Amad*,
    No. 10 CIV. 9395 SAS, 2011 WL 1792570 (S.D.N.Y. May 9, 2011) ....................16

*In re Papst Licensing Digital Camera Patent Litig.*,
    778 F.3d 1255 (Fed. Cir. 2015) ...........................................................................10

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) .................................................................9, 16, 18

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,
    237 F.3d 1359 (Fed. Cir. 2001) ...........................................................................16

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) .....................................................................15, 18

*Tinnus Enters., LLC v. Telebrands Corp.*,
    846 F.3d 1190 (Fed. Cir. 2017) .......................................................................9, 20

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) ...........................................................................13

*Trebo Mfg., Inc. v. Firefly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014) .....................................................................10, 15

*Visto Corp. v. Seven Networks, Inc.*,
    No. 2:03-CV-333-TJW, 2006 WL 3741891 (E.D. Tex. Dec. 19, 2006) ...............15

*Whirlpool Corp. v. Glob. Purification, LLC*,
    No. 2:16-CV-463-JRG, 2017 WL 2099771 (E.D. Tex. May 15, 2017) ................18

**Statutes**

35 U.S.C. § 271 .............................................................................................................9

35 U.S.C. § 283 .............................................................................................................9

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff ActiveProspect, Inc. ("ActiveProspect") respectfully asks the Court to immediately enjoin Tech Prosper LLC ("Tech Prosper") and Data Prosper, LLC ("Data Prosper") (collectively, "Defendants") from making, using, distributing, selling, offering for sale, advertising, or otherwise promoting their Compliant Lead product and any other product or service that infringes ActiveProspect's United States Patent No. 10,614,417 (the "'417 Patent").[1] Defendants' Compliant Lead product is an unauthorized copy of ActiveProspect's patented TrustedForm product, which Defendants are willfully passing-off as their own invention and intellectual property.

ActiveProspect obtained the '417 Patent to protect its TrustedForm product—an innovative solution to a long existing problem of fraud in the online lead generation industry. ActiveProspect has enjoyed substantial success through TrustedForm, including customer praise that describes the product as a "must have" for those in the industry. Through its success in developing both TrustedForm and the niche lead verification market, ActiveProspect has grown to be recognized as a thriving innovator and leader in its field. Defendants seek to illegally capitalize on ActiveProspect's time, expense, and goodwill by selling Compliant Lead, their knock-off version of TrustedForm, at a significantly lower price. If Defendants are not immediately enjoined from directly competing against ActiveProspect's patented TrustedForm product, ActiveProspect will be irreparably harmed—the exact circumstance that a preliminary injunction is designed to prevent.

---

[1] Although ActiveProspect asserts multiple causes of action and multiple claims of the '417 Patent, *see* Dkt. #1, this motion is based only on Defendants' infringement of Claim 1 of the '417 Patent.

## II.      BACKGROUND

### A.      ActiveProspect Invents TrustedForm and Obtains the '417 Patent.

In 2004, Steve Rafferty founded ActiveProspect, which is in the business of online lead generation and lead management. Rafferty Decl. ¶ 8. Lead management simplifies the process of generating, selling, and purchasing the information of prospective customers for various services and products. *Id.* With the creation of the Internet, consumers were able to fill-out forms online to request to be contacted about goods and services of interest. *Id.* As online advertising moved to a performance-based model, companies increasingly engaged in Cost-Per-Lead advertising models. *Id.* ActiveProspect's products are tailored to internet collected leads. *Id.*

Mr. Rafferty oversaw the development of ActiveProspect's first product, LeadConduit, a software as a service (SaaS) product designed to simplify the process of managing leads. *Id.* LeadConduit is a lead management service that simplifies the process for tracking, filtering, integrating, and otherwise dealing with leads that are bought and sold. *Id.*

While growing ActiveProspect, Mr. Rafferty and his team observed increasingly fraudulent activity involving lead sellers. *Id.* ¶ 9. Lead buyers complained that lead sellers were selling fraudulent leads—leads that were not for actual customers or leads for customers who had not signed-up for a particular service or product offering. *Id.* This problem in the market gave Mr. Rafferty and ActiveProspect the idea to begin authenticating leads as a third-party verification service. *Id.* ¶ 10. By authenticating the lead, ActiveProspect would provide confirmation to the lead purchaser that the customer information contained in the lead was genuine and that the customer had consented to provide the information; for the lead seller, the authenticated lead would become more valuable and could be sold at a premium. *Id.*

This idea led to the creation of ActiveProspect's proprietary lead verification SaaS product, TrustedForm, which the inventors protected by securing the '417 Patent. *Id.* ¶¶ 10–11. On May

12, 2011, the inventors filed U.S. Patent Application No. 13/106,641 entitled "System and Method for Electronic Lead Verification" for their invention, which led to the issuance of the '417 Patent on April 7, 2020. *Id.* ¶ 11.

Mr. Rafferty and the other inventors worked for ▮▮▮▮▮ to develop the initial version of TrustedForm, which was only a minimum viable product. *Id.* ¶ 12. When ActiveProspect first unveiled TrustedForm, the industry was skeptical of its benefits. *Id.* ¶ 13. TrustedForm was a completely novel solution and there were few early adopters. *Id.* It took ActiveProspect years of painstaking work to explain the benefits of TrustedForm to potential customers before it finally started gaining traction in the market. *Id.* Through ActiveProspect's persistent efforts to educate the industry, and in light of the increasing need to prove customer consent and the tightening of consumer protections brought about by the Telephone Consumer Protection Act (TCPA) in 2013, the industry grew to accept TrustedForm and recognize the incredible value that it provides. *Id.*

The current, industry leading version of TrustedForm has required ▮▮▮▮ of dollars, ▮▮▮▮▮ of man-hours, and ▮▮▮ of employees to develop. *Id.* ¶ 16. To support TrustedForm, ActiveProspect allocates more than ▮▮▮ employees solely to TrustedForm's success and has spent over ▮▮▮▮ in operating costs on TrustedForm. *Id.* ¶¶ 15–16. TrustedForm is now used by over ▮▮ companies and verifies over ▮▮▮▮ leads per month. *Id.* ¶ 14.

TrustedForm has become key to ActiveProspect's business model. *Id.* ¶ 17. For the past seven to eight years, TrustedForm has been the most significant driver of ActiveProspect's growth, and it now represents ▮▮▮ of ActiveProspect's total revenue. *Id.* ¶ 17. Beyond driving growth internally, TrustedForm is consistently praised in the industry as a "must have" product for lead buyers and sellers, and TrustedForm has received industry awards recognizing its value. *Id.* ¶¶ 18–20.

TrustedForm works by implementing a proprietary JavaScript on the lead seller's website. Wolfe Decl. ¶ 12. Once the script is implemented, whenever a user visits the page, the script begins executing steps to document the visit and validate the potential lead. *Id.* For example, the script will generate a unique ID for the transaction, gather information about the website and the user, and links that data to the unique ID. *Id.* After the user submits the contact form, the lead buyer or seller can request the information that TrustedForm has verified, which TrustedForm will send in the form of a TrustedForm certificate, an example of which is shown below:



*Id.* ¶¶ 12–14, Fig. 1.

ActiveProspect has strenuously protected its intellectual property rights behind TrustedForm. Rafferty Decl. ¶ 21. In addition to patenting TrustedForm, ActiveProspect has never licensed the '417 Patent or the TrustedForm technology to anyone, and it has no plans to do so. *Id.* Although ActiveProspect does have TrustedForm reseller agreements with other companies, each of those agreements clarifies that the reseller is not obtaining any rights to make or use ActiveProspect's intellectual property but, instead, is permitted only to resell TrustedForm. *Id.*

**B.      ActiveProspect Discovers Defendants' Knock-Off Product, Compliant Lead.**

In 2021, ActiveProspect became aware of Defendants when their CEO, Ross Breiman, reached out to one of ActiveProspect's employees, Adam Chickman, and expressed an interest in ActiveProspect acquiring his company. *Id.* ¶ 27. The parties eventually met for lunch while representatives of both ActiveProspect and Defendants were attending the Affiliate Summit East trade show in New York City. *Id.* At the lunch meeting, Mr. Breiman acknowledged that ActiveProspect is a market leader in the lead management industry and in the niche lead verification market. *Id.* ¶ 28. Although Mr. Breiman expressed appreciation for ActiveProspect's technological advancements in the lead management industry, he criticized ActiveProspect's products. *Id.* ¶ 29. Mr. Breiman claimed that ActiveProspect's unpatented LeadConduit product was too expensive and admitted that his team had copied LeadConduit to create their own competing product, Lead Prosper, which they offer for a much lower price. *Id.* Nevertheless, at the end of the lunch, Mr. Rafferty and Mr. Breiman agreed to remain in touch and collaborate in the future where possible. *Id.* ¶ 30.

ActiveProspect had no interest in acquiring a company that admittedly copied its product, LeadConduit. *Id.* ¶ 31. Additionally, Defendants lacked any unique intellectual property that would justify an acquisition. *Id.* Eventually, ActiveProspect agreed to allow Mr. Breiman's company, Tech Prosper, which does business as "Lead Prosper," to become an authorized reseller of TrustedForm. *Id.* ¶ 32. On September 21, 2021, Mr. Breiman signed ActiveProspect's Reseller Agreement on behalf of Tech Prosper. *Id.*

As an authorized TrustedForm reseller, Tech Prosper gained access to TrustedForm pricing information, and ActiveProspect assisted Tech Prosper in developing a go-to-market strategy for selling the product. *Id.* ¶ 34. Nonetheless, Defendants failed to sell any TrustedForm certificates or secure a single website to implement the TrustedForm script. *Id.* ¶ 35. Nor did they provide

ActiveProspect any feedback on the TrustedForm product. *Id.* Instead, Defendants used their access to TrustedForm to develop a direct copy, which they branded "Compliant Lead."

ActiveProspect first discovered Compliant Lead eight months after the lunch meeting, when Defendants used half of their booth at the LeadsCon trade show in Las Vegas in March 2022 to advertise their new Compliant Lead product. *Id.* ¶¶ 36, 38.

Based on Defendants' advertising claims at the trade show, Compliant Lead appeared to be a copy of TrustedForm. *Id.* ¶ 37. ActiveProspect immediately began an investigation into Compliant Lead and learned that Compliant Lead is advertised and offered for sale through a separate website located at compliantlead.com. *Id.* ¶ 39. ActiveProspect's investigation revealed that Compliant Lead has all of the same features and functions of ActiveProspect's patented TrustedForm product. *Id.* ¶ 40; Wolfe Decl. ¶¶ 20–21. For example, Compliant Lead produces a "Token of Authenticity," which is substantially the same as TrustedForm's "Certificate of Authenticity." Wolfe Decl. ¶¶ 18–19. A side-by-side comparison of the two shows that they contain the same information, displayed in a similar way:



*Id.* ¶ 19, Fig. 3. Moreover, both products are described as a "Lead certification service" that verifies "Internet Leads" using "proprietary JavaScript" that is deployed on webpages with "a contact request form." Rafferty Decl. ¶ 41. Both products' terms of service describe their respective certificates as including details about "the site visitor, the time of visit," and the site viewed. *Id.* Overall, the entire portion of Compliant Lead's terms of service that describes the functionality of the product is substantially a copy of ActiveProspect's description of its patented product:

| TrustedForm Terms of Service (Rafferty Decl. ¶ 41, Ex. A-13) | Compliant Lead Terms of Service (Rafferty Decl. ¶ 41, Ex. A-14) |
|---|---|
| The TrustedForm Service is a Lead certification service that independently verifies the origin of Internet Leads through the use of proprietary JavaScript ("TrustedForm for Web") installed on a web page . . . containing a contact request form. | The Compliant Lead Service is a Lead certification service that autonomously certifies the provenance of Internet Leads using proprietary JavaScript ("Compliant Lead Script") deployed on a web page with a contact request form. |
| The TrustedForm for Web . . . issue[s] a digital certificate ("TrustedForm Certificate") that is passed with the Lead as an additional data field. | The Compliant Lead Script generates a digital token ("Compliant Lead Token"), which is given as an extra data field with the Lead. |
| The TrustedForm Certificate includes information about the site visitor who submitted a Lead, the time of visit, and the form visited, including what was presented to the consumer. | The Compliant Lead Token contains details on the site visitor, the time of visit, and the site viewed, as well as a recording of the lead interactions with the page as it appeared to the site visitor. |

The similarities between the two products do not stop there—even the color scheme used on Compliant Lead's website is similar to the original color scheme that ActiveProspect previously used to promote TrustedForm. *Id.* ¶ 42.

ActiveProspect had its Chief Technology Officer, Alex Wolfe, perform an in-depth investigation into Defendants' Compliant Lead product. Wolfe Decl. ¶ 20. As part of his investigation, Mr. Wolfe performed a detailed analysis of the Compliant Lead product to determine whether it contained the elements of Claim 1 of the '417 Patent. *Id.* Using a web browser, he was able to view the script operating on Defendants' demo page for Compliant Lead and capture

information regarding the content and data being sent to and from the Compliant Lead Server. *Id.* Based on his review of the Compliant Lead product, he determined that it performs the method protected by Claim 1 of the '417 Patent. *Id.* ¶ 21.

In his review, Mr. Wolfe noted additional evidence of copying. For example, the Compliant Lead script references TrustedForm by name, which Mr. Wolfe determined was an effort to use TrustedForm's Certificates as part of a fingerprinting feature to further verify lead information. *Id.* ¶¶ 33–34. Additionally, Defendants copied TrustedForm's "sensitive field flagging" feature, which prevents the TrustedForm script from keeping of copy of certain sensitive information, like a lead's social security number. *Id.* ¶ 35.

## C.      Defendants Utilize a Harmful Pricing Model.

Both ActiveProspect and Defendants offer a per lead pricing model for their TrustedForm and Compliant Lead products. Rafferty Decl. ¶¶ 22–23, 43. Each plan includes tiers where the more leads are verified, the less expensive each certificate or token becomes. *Id.* However, under Defendants' pricing model, developed after learning how to price TrustedForm, Compliant Lead is significantly cheaper than TrustedForm, and the gap in pricing widens as more leads are verified. *See id.* ¶ 44. This pricing model makes Compliant Lead at least 22% less expensive than TrustedForm. *Id.* For the average TrustedForm customer, who verifies approximately ███ leads per month at a cost of ██████, Compliant Lead is over ███ cheaper. *Id.* ¶¶ 24, 44. Since launching their Compliant Lead product, Defendants have already attracted interest from current TrustedForm customers who have inquired about using Compliant Lead. *Id.* ¶ 45.

## D.      ActiveProspect Asked Defendants to Stop Infringing the '417 Patent.

On April 6, 2022, ActiveProspect's counsel sent Defendants a cease-and-desist letter asking Defendants to stop infringing the '417 Patent. McCabe Decl. ¶ 2, Ex. C-1. The letter included a copy of the '417 Patent and explained how Defendants' Compliant Lead product

infringes the patent. *Id.* In their response, Defendants refused to stop their infringement, refused to engage in meaningful discussions, and explained their intent to compete against ActiveProspect. *Id.* ¶ 3; Ex. C-2. Since that time, Defendants have continued to promote and offer to sell their Compliant Lead product, willfully infringing ActiveProspect's '417 Patent.

## III.   LEGAL STANDARD

As the owner of the '417 Patent, ActiveProspect has a statutory right to prevent others from making, using, selling, offering to sell, or importing the inventions of the patent in or into the United States. 35 U.S.C. § 271. This Court is authorized by statute to grant preliminary injunctive relief to protect those patent rights "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.

When ruling on a motion for preliminary injunction, the court considers four factors: (1) likelihood of success on the merits; (2) irreparable harm; (3) balance of hardships; and (4) the public interest. *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017). As this Court has recognized, "none of the four requirements has a fixed quantitative value." *Gonza LLC v. Mission Competition Fitness Equip. LLC*, No. W-21-CV-00771-ADA, 2021 WL 5657193, at *2 (W.D. Tex. Dec. 1, 2021) (Albright, J.) (internal citations omitted). Thus, "in applying the four part test, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id*; *see also Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990). While the patentee must prove each factor, it can rely on statutory and other presumptions to satisfy that burden. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996).

## IV.  ACTIVEPROSPECT IS ENTITLED TO A PRELIMINARY INJUNCTION

### A.  ActiveProspect Is Likely to Succeed on the Merits of Its Infringement Claim.

To show a likelihood of success on the merits, ActiveProspect "need not prove it is entitled to summary judgment . . . [r]ather, the movant must present a *prima facie* case." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 695 (W.D. Tex. 2019). To do so ActiveProspect must provide evidence that shows it is more likely than not that Compliant Lead infringes the '417 Patent. *Trebo Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014). Additionally, ActiveProspect must demonstrate that it is likely to withstand any challenges to validity that Defendants may make. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017). Here, it is highly likely that ActiveProspect will succeed on the merits of its patent infringement claim.

### 1.  Compliant Lead Willfully Infringes the '417 Patent.

Courts engage in a two-step analysis to determine whether infringement has occurred: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993).[2] "To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

As part of ActiveProspect's investigation into Compliant Lead, one of the named inventors of the '417 Patent, Alexander Wolfe, reviewed the Compliant Lead JavaScript and Compliant

---

[2] None of the terms in Claim 1 require additional construction to determine infringement for purposes of this preliminary injunction. *See In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("We generally give words of a claim their ordinary meaning"). ActiveProspect reserves the right to propose terms and constructions in accordance with the Court's standard order governing patent cases.

Lead's terms of service to determine its functionality. Wolfe Decl. ¶ 20. The results of that review

establish that Defendants' Compliant Lead product performs each step of Claim 1 of the '417

Patent. *Id.* ¶ 21.

> **Claim 1 – Element 1: receiving a first request at a lead verification server from a web browser in response to the web browser visiting a web page of a lead generating website and executing a lead verification service script, the lead generating website configured to collect lead data for a lead generator**

The Compliant Lead demo page located at https://www.compliantlead.com/demo is a

sample lead generation form configured to use Compliant Lead's lead verification service script.

*Id.* ¶ 22. When a web browser visits this web page, it reads the HTML of the page which, due to

the contained configuration to use Compliant Lead's lead verification service, instructs the browser

to load and execute the lead verification service JavaScript from https://assets.compliantlead.com/

record/cl.js. *Id.* When cl.js is executed by the web browser, it instructs the web browser to load

and execute two additional JavaScripts, cl.bundle.js and cl.worker.js. *Id.* The JavaScript contained

in cl.bundle.js is responsible for communicating with Compliant Lead's lead verification service

located on a server at the record.compliantlead.com domain. *Id.* ¶ 23. The JavaScript

communicates with the lead verification service in two ways:

(1) https://record.compliantlead.com/session (Session Endpoint) generates the reference key

(Token); and (2) https://record.compliantlead.com/events (Events Endpoint) records the HTML of

the page, all of the interactions the user has with the web page, and changes in the HTML that

occur during the user's visit to the web page. *Id.* The lead verification service script (cl.bundle.js)

makes a request for a reference key, which is received by the lead verification server, by calling

the Session Endpoint. *Id.* ¶ 24.

**Claim 1 – Element 2: responding to the first request at the lead verification server by sending a reference key to the web browser**

Compliant Lead's lead verification server sends the reference key (Token) in response to the lead verification service script (cl.bundle.js) by calling the Session Endpoint. *Id.* ¶ 25. The Session Endpoint responds by sending the reference key to the web browser. *Id.*

**Claim 1 – Element 3: collecting information about the lead generating website and information associated with a user of the web browser**

The JavaScript (cl.bundle.js) calls the Events Endpoint for the purpose of collecting information associated with the user's visit to the page. *Id.* ¶ 26. Each call to that service contains a list of "events" that is specially encoded. *Id.* By decoding the events collected and sent to the lead verification service, Mr. Wolfe verified that each event contains a representation of the HTML of the lead generating site, changes to that HTML as the user interacts with the web page through the browser, and all information entered by the user in the form inputs. *Id.* ¶ 27.

**Claim 1 – Element 4: associating the collected information with the reference key**

In response to the Token being sent to the web browser by the Session Endpoint, the lead verification script (cl.bundle.js) retains the Token (i.e., h5iggbyn2jeb3tl94y) for the purpose of associating it to the collected information. *Id.* ¶ 28. When the collected information is sent to the Events Endpoint by the lead verification script (cl.bundle.js), the Token (i.e., h5iggbyn2jeb3tl94y) is associated with the collected information. *Id.*

**Claim 1 – Element 5: receiving, from an interested third party that is separate from the lead generating website and the lead generator after the interested third party receives the lead data and the reference key from the lead generator, a second request for verification of the lead data, the second request including the reference key**

When the user submits the form on the web page, the Token accompanies the information collected on the form in a hidden form field named "cl_token_url." *Id.* ¶ 29. An interested third party receiving the lead data and the Token URL can then click on that URL to view the Compliant

12

Lead "Token of Authenticity" record that shows all the collected information. *Id.* ¶ 30. Like all website interactions, when the user inputs the URL into their browser, the web browser sends a request for the HTML text associated with that specific URL to Compliant Lead's server. *Id.*

> **Claim 1 – Element 6: in response to the second request, sending at least some of the collected information to the interested third party**

The Token URL, which is submitted with the form to the interested third party, sends collected information to the interested third party by way of visual display in the third party's web browser when requested by the interested third party. *Id.* ¶ 32.

### 2.       The '417 Patent Is Valid.

"To begin, the patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). Because "invalidity is an affirmative defense, . . . the patentee need not address invalidity as an initial matter in filing for a preliminary injunction." *Gaymer Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1375 n.7 (Fed. Cir. 2015). Until and unless Defendants challenge the validity of the '417 Patent, "the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." *Id.*

### B.       ActiveProspect Will Be Irreparably Harmed in the Absence of an Injunction.

ActiveProspect will be irreparably harmed if Defendants are permitted to continue to offer for sale their willfully infringing Compliant Lead product and thus illegally enter the niche online lead generation market in which TrustedForm is sold. ActiveProspect is entitled to an injunction because it will suffer damages that are not compensable with money and are therefore irreparable. *See Allied Mktg. Grp., Inc. v. CDL Mktg.*, Inc., 878 F.2d 806, 810 n.1 (5th Cir. 1989) ("the central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is

whether the plaintiff's injury could be compensated by money damages."). Courts routinely recognize that "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012); *see also Gonza*, 2021 WL 5657193, at *13–14 (granting preliminary injunction based in part on price erosion). That the "parties . . . are market competitors may weigh heavily in the analysis of this factor." *Gonza*, 2021 WL 5657193, at *5; *see also Brooktrout Inc. v. Eicon Networks Corp.*, No. 2-03-CV-59, 2007 WL 1730112, at *1 (E.D. Tex. June 14, 2007) (finding irreparable harm where the parties were direct competitors).

Here, Defendants are using ActiveProspect's patented technology to become only the third competitor in the lead verification market. Should their attempt be successful, ActiveProspect will risk at least irreparable price erosion, loss of goodwill, and a compulsory license. The reduction in price necessitated by Defendants' action will ███████████████████████████████ ██████████████████ and will be unrecoverable once made. Moreover, should ActiveProspect refuse to lower its prices in response to Defendants infringement, ███████████████████ ██████ These are all harms that cannot later be remedied by monetary relief.[3]

### 1.   There Is Only One Other Legitimate Competitor Who Offers a Similar Product.

Absent an injunction, ActiveProspect and Defendants will become competitors in the lead verification market, a niche portion of the online lead generation market that currently has only two competitors. Where the parties compete directly against each other in a small market, irreparable harm is more likely. *Brooktrout*, 2007 WL 1730112, at *1 ("intellectual property is

---

[3] There should be no dispute that ActiveProspect's patent "drives consumer demand for the accused product" because Defendants' product is a copy of TrustedForm, which is an embodiment of the '417 Patent. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012); Wolfe Decl. ¶ 11.

quite valuable when it is asserted against a competitor in the plaintiff's market."). *Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333-TJW, 2006 WL 3741891, at *4 (E.D. Tex. Dec. 19, 2006) ("The parties to this case are direct competitors, and this fact weighs heavily in the court's analysis."). Because the market has few competitors, this serves as "a substantial ground for granting an injunction." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011); *Trebro Mfg.*, 748 F.3d at 1170 ("The district court clearly erred in finding as speculative the harm Trebro is likely to suffer if its direct competitor is able to sell an infringing product in the small, niche sod harvester market."); *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 2:06-CV-381-JRG, 2014 WL 8708239, at *8 (E.D. Tex. Mar. 31, 2014) (granting permanent injunction where "in this narrow and consolidated market, Golden Hour and emsCharts are head-to-head competitors, albeit not the only competitors.").

As explained by ActiveProspect's CEO, Steve Rafferty, while the online lead generation marketplace is a vast, multi-billion-dollar industry, only two companies independently verify leads, ActiveProspect and Jornaya, though they are able to coexist to a degree. Rafferty Decl. ¶¶ 25–26. This niche portion of the market, lead verification, represents ▉ of ActiveProspect's business. *Id.* ¶ 17. It is difficult to acquire a customer in this market, as a customer must either agree to implement the verification service's script on its own website or must be working with a lead vendor who has implemented the verification service's script before it can begin verifying leads through either ActiveProspect or Jornaya. Wolfe Decl. ¶ 12, 14.

Defendants admittedly are using their infringing product, Compliant Lead, to enter this niche portion of the market at ActiveProspect's expense. Indeed, Defendants' letter in response to ActiveProspect's cease-and-desist letter completely ignored the merits of ActiveProspect's patent infringement claim and stated that they intend to actively compete in the lead verification market

15

with a less expensive copy of TrustedForm. McCabe Decl. ¶¶ 2–3, Ex. C-1–C-2. Despite having

knowledge of ActiveProspect's '417 Patent and of their infringement, Defendants are positioning

themselves as a direct competitor to ActiveProspect. The loss of even a single customer to an

illegitimate competitor could lead to Compliant Lead spreading across the internet and displacing

TrustedForm completely. Rafferty Decl. ¶¶ 49–50. This is particularly true because Compliant

Lead is a copy of Trusted Form. *See id* ¶ 40; Wolfe Decl. ¶ 21. These lost customers will be

difficult—if not impossible—to quantify given the variability in revenue associated with the lead

verification market. Rafferty Decl. ¶¶ 51–53. Defendants' blatant disregard for ActiveProspect's

patent rights justifies the issuance of a preliminary injunction to immediately stop this illicit

behavior.

### 2.       Defendants' Entrance to the Market Will Cause Price Erosion.

Should Defendants' attempt to enter the lead verification market succeed, their lower

pricing model for Compliant Lead is likely to cause irreparable price erosion and a corresponding

loss of goodwill for ActiveProspect. Courts have long recognized that the risk of price erosion

justifies the issuance of a preliminary injunction. *Purdue Pharma L.P. v. Boehringer Ingelheim*

*GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) ("Given the testimony of the likelihood of price

erosion and loss of market position without corresponding market expansion from the introduction

of Roxane's product, we see no deficiency in the district court's finding of irreparable harm.");

*Gonza*, 2021 WL 5657193, at *7 ("Gonza need not be forced into a loss of market share or lower

price due to a direct competitor that likely infringes its product."); *Mint, Inc. v. Amad*, No. 10 CIV.

9395 SAS, 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011) (A plaintiff's "loss of pricing power

resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable."). Price

erosion is irreparable because when a patentee is forced to reduce its prices during litigation to

compete with a cheaper priced knock-off, "[r]equiring purchasers to pay higher prices after years

of paying lower prices to infringers is not a reliable business option." *Polymer Techs.*, 103 F.3d at 976; *see also Gonza*, 2021 WL 5657193, at *7 (finding that "loss of goodwill similarly runs with price erosion . . . [and that] [s]hould Gonza reduce its price to compete, cutting into its profits and reducing its higher margins[,] . . . any later effort to restore the original price would result in a loss of customer goodwill").

Compliant Lead is, in all technical and patented aspects, an identical product to TrustedForm. *See* Wolfe Decl. ¶¶ 17–35. However, there is one key difference—Compliant Lead is offered at a substantial discount because Defendants were able to avoid significant research and development costs and, as a result, capitalize on the market ActiveProspect spent years developing by stealing ActiveProspect's technology. *See* Rafferty Decl. ¶¶ 10–16. At every price point, Compliant Lead is offered at a lower price than TrustedForm:

| API Requests for a Certificate Per Month | TrustedForm | Compliant Lead | Difference as a Percentage |
|---|---|---|---|
| 10,000 | $    1,230.00 | $    950.00 | 22.76% |
| 15,000 | $    1,830.00 | $  1,250.00 | 31.69% |
| 20,000 | $    2,430.00 | $  1,550.00 | 36.21% |
| 30,000 | $    3,430.00 | $  2,150.00 | 37.32% |
| 50,000 | $    5,430.00 | $  3,350.00 | 38.31% |
| 75,000 | $    7,930.00 | $  4,350.00 | 45.15% |
| 100,000 | $  10,430.00 | $  5,350.00 | 48.71% |
| ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |

Rafferty Decl. ¶ 44

As this Court recently explained, "[b]ecause consumers are faced with seemingly identical products at starkly different price points, [ActiveProspect]'s fear of price erosion is not a future or speculative harm, but an immediate and irreparable one." *See Gonza*, 2021 WL 5657193, at *7. To compete with Compliant Lead, ActiveProspect will be required to reduce its prices. Rafferty Decl. ¶ 46. This will reduce ActiveProspect's profits to a level that will ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 47. Even

if Defendants later exit the market, ████████████████████████████████████████

████████████████████████████████████████████████████████████████ *Id.* ¶ 48.

### 3. Competing Against a Knock-Off Version of ActiveProspect's Own Product Is, on Its Own, Irreparable Harm.

Inherent in a patent is the right to exclude others from practicing that invention. Where an infringer uses that patent to develop a directly competing product, the patentee suffers irreparable harm from the loss of the right to exclude. *Robert Bosch*, 659 F.3d at 1156 ("requiring [a patentee] to compete against its own patented invention . . . places a substantial hardship on [the patentee]"); *Polymer Techs.*, 103 F.3d at 976 ("The right to exclude others from a specific market, no matter how large or small that market, is an essential element of the patent right."); *Whirlpool Corp. v. Glob. Purification, LLC*, No. 2:16-CV-463-JRG, 2017 WL 2099771, at *3 (E.D. Tex. May 15, 2017) ("Allowing Defendant to continue selling the infringing products would effectively force Plaintiff to compete against a direct competitor despite that competitor's infringement of Plaintiff's patents. This is the type of irreparable harm that, when considered along with the other *eBay* factors, warrants a permanent injunction."). Where a patentee refuses to license its product, an injunction is necessary to prevent a compelled license which runs contrary to the purpose of the patent laws. *See Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) (finding preliminary injunctive relief appropriate to prevent "infringers [from] becom[ing] compulsory licensees for as long as the litigation lasts"); *see also Gonza*, 2021 WL 5657193, at *7 ("[The patentee] is entitled to exclude alleged infringers . . . to avoid otherwise irreparable harm.").

Here, ActiveProspect values its right to exclude others from practicing its invention, which is why ActiveProspect has not licensed TrustedForm to any competitors and instead seeks to maintain exclusivity as the only company that can provide the patented services. *See* Rafferty Decl.

¶ 21. However, because Defendants are entering the market with their willfully infringing copy of TrustedForm, ActiveProspect will be forced to compete against a lower-priced version of its own product. Should the Court deny ActiveProspect's request for a preliminary injunction, even a later successful decision on the merits and an award of damages would result in a compulsory license and allow Defendants to continue eroding ActiveProspect's pricing and market position. To avoid this irreparable harm, the Court must immediately stop Defendants' infringement.

### C.    The Balance of Hardships Favors ActiveProspect.

The balance of hardships significantly favors ActiveProspect. Not only has ActiveProspect invested millions of dollars in its research and development of TrustedForm, but it also pioneered the lead verification market. Rafferty Decl. ¶¶ 10–16. On the other hand, Defendants have broken into the market by riding on TrustedForm's hard work and goodwill. The Court should not permit this flagrant violation of the patent laws. "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008). Defendants took a "calculated risk in selling a product with knowledge of [ActiveProspect's] patent" and cannot now complain about the harms of that choice. *Celsis*, 664 F.3d at 931. Where a Defendant sells "nothing more than a mere copy of [the patentee's product], but at a lower price" the balance of hardships favors the patentee. *Gonza*, 2021 WL 5657193, at *8. Moreover, Defendants have other established products in addition to their new Compliant Lead product, which they have only recently begun to offer for sale. While an injunction may have some minor impact on Defendants' business, forcing ActiveProspect to either lower its prices or lose customers in the interim will cause significant damages to its entire business. *See* Rafferty Decl. ¶¶ 46–53. Therefore, the balance of hardships favors ActiveProspect.

### D.       The Public Interest Favors Protecting ActiveProspect's Patent Rights.

"The public is best served by enforcing patents that are likely valid and infringed." *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *see also MGM Well Services, Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 379–80 (S.D. Tex. 2007), *aff'd*, 264 F. Appx' 900 (Fed. Cir. 2008) ("The public interest is best served by protecting patent rights and enforcing the applicable laws."). As this Court recently recognized, "[t]he incentive to research and develop new products 'would be adversely affected by taking market benefits away from the patentee and giving them to the accused infringer.'" *Gonza*, 2021 WL 5657193, at *8 (quoting *Celsis*, 664 F.3d at 930). Here, the public interest is best served by preventing Defendants from entering the lead verification market with their cheap knock-off of ActiveProspect's patented product.

## V.     CONCLUSION

The facts set forth above show that Defendants attempt to rip-off ActiveProspect's patented technology will cause irreparable injury to ActiveProspect. Defendants cannot be permitted to use ActiveProspect's patented technology to prematurely enter an industry that ActiveProspect spent years and millions of dollars to develop by selling a knock-off of TrustedForm. Such an entrance will cause irreparable harms in at least the form of price erosion, loss of goodwill, and a compulsory license. ActiveProspect has also shown a strong likelihood of success on the merits, that the balance of hardships favors ActiveProspect, and that the public interest favors granting injunctive relief. Thus, ActiveProspect has demonstrated its entitlement to an injunction and respectfully requests the Court enjoin Defendants from continued infringement of the '417 Patent.

Dated:  May 25, 2022

Respectfully submitted,

*/s/ Michael A. McCabe*
Michael A. McCabe
Texas Bar No. 24007628
mmccabe@munckwilson.com
Amy. E. LaValle
Texas Bar No. 24040529
alavalle@munckwilson.com
MUNCK WILSON MANDALA, LLP
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 fax

*Attorneys for Plaintiff ActiveProspect, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served via email and overnight delivery via Federal Express to the following attorney for Defendants:

Robert Garson
20803 Biscayne Boulevard, Suite 405
Aventura, Florida 33180
rg@gs2law.com
(305) 780-5212

*/s/ Michael A. McCabe*
Michael A. McCabe

## CERTIFICATE OF CONFERENCE

I certify that that, pursuant to Local Court Rule CV-7(G), prior to filing this motion, on April 6, 2022, the undersigned sent a letter to Defendants requesting Defendants cease selling the Compliant Lead product addressed in Plaintiff's Motion for Preliminary Injunction. On April 13, 2022, Defendants' counsel responded to the letter stating Defendants refused to do so. Thus, while Defendants have yet to appear in this suit, I understand that Defendants oppose this motion.

*/s/ Michael A. McCabe*
Michael A. McCabe